0IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. ELH-94-10 |
| SEAN KIRKLAND, | |
| *Defendant*. | |

**MEMORANDUM OPINION**

Defendant Sean Kirkland[1] has been incarcerated since March 15, 1994, when he was 24 years old.  ECF 354 (Presentence Report, "PSR"), at 1; ECF 405 (same).[2]  He is serving a total sentence of life imprisonment for multiple crimes:  conspiracy to distribute and possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A)(ii) and § 846; killing, in furtherance of a drug conspiracy, in violation of 21 U.S.C. § 848(e); conspiracy to murder a witness, in violation of 18 U.S.C. § 371; and two counts of aiding and abetting the murder of a federal witness, in violation of 18 U.S.C. § 1512(a)(1)(A) and (a)(1)(C) and 18 U.S.C. § 2.  Defendant, who is now 55 years of age, is currently incarcerated at FCI McKean in Pennsylvania.  *See Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/ (search by BOP Register Number 29998-037) (last accessed September 3, 2024).

---

[1] In some documents, defendant's name appears as "Shawn Kirkland," "Shawn Kemp," and "Seth Webb."  I will refer to him as "Sean Kirkland," because it is consistent with defendant's filings.

[2] The case was originally assigned to Judge William Nickerson.  It was reassigned to me in 2020, due to the retirement of Judge Nickerson.  *See* Docket.  I located a copy of the PSR in the Chambers file of Judge Nickerson and I submitted it for docketing, under seal.

Kirkland filed a "Pro-Se Motion to Reduce Sentence Pursuant to 18 U.S.C. 3582(c)(1)(A) for Immediate Release."  ECF 338.  He requested a reduction of his sentence to time served "or, alternatively, to a term of years short of life that this Court finds is consistent with the dictates of 18 U.S.C. 3553(a)."  *Id.* at 4.  The Motion is supported by one exhibit, which includes COVID-19 vaccination records and defendant's administrative efforts to obtain compassionate release.  ECF 338-1.  The government opposed the Motion and submitted three exhibits.  ECF 343.  Kirkland replied.  ECF 344.

Thereafter, I appointed counsel for Mr. Kirkland.  ECF 360.  Through counsel, Kirkland submitted a supplement to the motion.  ECF 403.  He also submitted several exhibits.  ECF 405, ECF 405-1 to ECF 405-8.  I shall refer to ECF 338 and ECF 403 collectively as the "Motion."  The government responded to the supplement.  ECF 412.  It also submitted additional exhibits.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion, in part; I shall reduce defendant's sentence as to Count Four and Count Five to 40 years of imprisonment.

## I.      Background[3]

Kirkland was one of eight defendants in the case.  *See* ECF 35 at 1.  Nathaniel Dawson, Jr. ("Dawson, Jr.") and his father, Nathaniel Dawson, Sr. ("Dawson, Sr."), were among the codefendants.  Dawson, Jr. was the leader of a cocaine trafficking organization in Baltimore. *United States v. Dawson*, *et al.*, 141 F.3d 1160 (table), 1998 WL 188636, at *1 (4th Cir. April 21, 1998) (per curiam).  Kirkland was Dawson's "chief lieutenant."  *Id.*

---

[3] Due to the age of the case, many of the pleadings are not electronically available.  Filings became consistently available electronically in 2011, with sporadic availability prior to that time.

Kirkland was primarily tasked with "overseeing the sellers" and, "[a]t the end of each day, Dawson and Kirkland would collect the proceeds and tally the profits at a house Kirkland shared with his girlfriend, Mary Personeus." *Id.* Dawson, Jr.'s girlfriend, Beverly Brown, assisted Dawson, Jr. "in delivering cocaine and firearms to various stash houses near locations where the drugs were sold." *Id.*

On November 4, 1993, Dawson, Jr. and two bodyguards were involved in a shooting with a car that "drove into [Dawson, Jr.'s] 'drug turf.'" ECF 403 at 2 (citation omitted). One of Dawson, Jr.'s bodyguards approached the car, and then "[w]ords were exchanged and Dawson drew his firearm, prompting [the bodyguards] to do likewise." *Dawson*, 1998 WL 188636, at *1. The bodyguards "then began firing their weapons, intending to kill the occupants of the vehicle." *Id.* Tragically, "a stray bullet struck and killed" ten-year-old Tauris Johnson, who had been playing football. *Id.* Kirkland was present at the time, but was not found to have engaged in the shooting. ECF 355 (Sentencing Transcript), at 40–42; ECF 405-1 (same). As defendant's attorney puts it, the "tragic death" of "a young boy playing football with his friends" on a public street in Baltimore "propelled the case into the public's consciousness." ECF 403 at 1, 2.

After the shooting, Dawson, Jr., the bodyguards, and others fled to New York City. Dawson, Jr. initially asked Gregory Lyons "to 'take care of the witnesses' against Dawson." *Dawson*, 1998 WL 188636, at *2. However, Lyons refused. *Id.* So, Dawson, Jr.'s father, Dawson, Sr., "took it upon himself to silence the witnesses . . . ." ECF 403 at 2. "Dawson, Sr. showed Kirkland the indictment [against his son] and stated that he was going to kill all of the witnesses against Dawson." *Dawson*, 1998 WL 188636, at *2.

Latisha Murphy, a 34-year-old mother of three, had allowed the drug ring to use her residence as a stash house. ECF 403 at 2. On January 13, 1994, she "testified before a federal

3

grand jury investigating Tauris Johnson's homicide and the drug related activities of Dawson Jr. and others." *See* Brief of Government, *United States v. Dawson*, 1996 WL 33454096 (4th Cir. Nov. 13, 1996) ("Gov't. Brief"), at *3. Kirkland subsequently identified Murphy to Dawson, Sr. *Dawson*, 1998 WL 188636, at *2. On February 12, 1994, Dawson, Sr. shot Murphy twice in the head, killing her. *Id.*; Gov't. Brief at *3.

Kirkland was arrested on March 15, 1994. Gov't. Brief at *3: *see also* ECF 354 at 1. On March 17, 1994, the grand jury returned a First Superseding Indictment, adding Kirkland and others to the case. Gov't. Brief at *3.

On June 2, 1994, the grand jury returned a Second Superseding Indictment. ECF 35. Seven people, including Dawson, Jr.; Dawson, Sr.; Kirkland; Brown, and others, were charged in Count One with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846.[4] Dawson Jr., Kirkland, Lyons, Eric Drayton, and John Doe were charged in Count Two with the intentional killing of another (Johnson) while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A), in violation of 21 U.S.C. § 848 (e)(1)(A) (*i.e.*, "Continuing Criminal Enterprise"); Count Three charged Dawson, Jr., Dawson, Sr., and Kirkland with conspiracy to murder a government witness (Murphy), in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1512(a)(1)(A) and (C). They were charged in Count Four with killing and aiding and abetting the killing of a federal witness (Murphy) to prevent her attendance or testimony at an official proceeding, *i.e.*, trial, in violation of 18 U.S.C. § 1512(a)(1)(A) and § 2. Count Five charged them with killing and aiding and abetting the murder of Murphy to prevent her communication with law enforcement officials or a

---

[4] Some of the defendants were initially identified as "John Doe."

judge, in violation of 18 U.S.C. § 1512(a)(1)(C) and § 2.  ECF 354 at 1; *see also* Gov't. Brief at **3–4.

In October 1994, Kirkland, Dawson, Jr., Dawson, Sr., and Brown proceeded to a fourteen-day jury trial at which Judge Nickerson presided.  *See* Docket; ECF 354, ¶ 1; Govt. Brief at **4–5.  Of relevance here, the government presented evidence that from 1991 until Kirkland's arrest in 1994, Kirkland was a member of a drug conspiracy led by Dawson, Jr.  ECF 354 at 3.  As noted, Kirkland "served as Dawson's chief lieutenant."  *United States v. Dawson*, 141 F.3d 1160, at *1.  The government claimed that it was foreseeable that the drug organization distributed 18.88 kilos of cocaine powder during the conspiracy.  Govt. Brief at **4–5.  The government also presented evidence establishing that Kirkland attempted to intimidate and unlawfully influence his girlfriend, Personeus, after she informed him that she was working with law enforcement.  ECF 354, ¶ 5.  The jury returned guilty verdicts on November 9, 1994.  Gov't. Brief at *5.

In computing the offense level for Kirkland under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the PSR explains that Count One and Count Two were "grouped together because the murder of Tauris Johnson in Count [Two] is directly related to the 'turf battle' to sustain the drug distribution operation which is charged in Count [One]."  ECF 354, ¶ 10.  Counts Three, Four, and Five were also "grouped together because they all involve the same victim, Government witness Leticia [sic] Murphy."  *Id.* ¶ 9.

As to Counts One and Two, Kirkland had a base offense level of 43 under U.S.S.G. § 2A1.1, which "provides that offenses involving an intentional killing in furtherance of a drug conspiracy have a base level of 43."  *Id.* ¶ 11.  Kirkland received an upward adjustment of three levels for his role in the offense, as he "was identified as a lieutenant in the Dawson, Jr. organization which [was] comprised of five (5) or more participants."  *Id.* ¶ 14.  In addition,

Kirkland received an upward adjustment of two levels for obstruction of justice because, "[f]ollowing his arrest," through "telephone conversations" with Personeus, Kirkland "attempted to influence her trial testimony." *Id.* ¶ 16. The adjusted offense level was 48. *Id.* ¶ 17. However, under the Guidelines, 43 is the highest offense level.

Group Two consisted of Counts Three, Four, and Five. ECF 354 at 6. The base offense level was 43, under U.S.S.G. § 2A1.1. *Id.* ¶ 18. Count Four and Count Five both involved a killing and charged the violation of 18 U.S.C. § 1512(a). And, 18 U.S.C. § 1512(a)(2)(A) "prescribes the punishment provided in 18 U.S.C. § 1111." *Id.* ¶ 19.[5] Under 18 U.S.C. § 1111, "[t]he statutory mandatory minimum penalty for a violation of 18 U.S.C. § 1111 is life imprisonments [sic]." *Id.* ¶ 20. Moreover, the PSR stated that "'life imprisonment is the appropriate punishment for premeditated killing.'" *Id.* It also stated that, because "[t]he statutory mandatory minimum sentence that can be imposed in this case is life imprisonment . . . any technical application of the Guidelines would be overridden by a life sentence, requiring an offense level of 43." *Id.* Thus, the PSR indicated that there were "no adjustments under Specific Offense Characteristics, Role in the Offense, Restraint of Victim, Obstruction of Justice, or Acceptance of Responsibility." *Id.*; *see also id.* ¶¶ 21–24. Therefore, Kirkland's adjusted offense level for these counts was 43. *Id.* ¶ 25.

In addition, the PSR included a Multiple Count Adjustment. It took into account all charges and added two levels under U.S.S.G. § 3D1.4(c). *Id.* ¶¶ 26–32. This yielded a total offense level of 50. *Id.* ¶ 32.

---

[5] The applicable punishment is now set forth in 18 U.S.C. § 1512(a)(3)(A).

With respect to Counts Four and Five, Kirkland faced a mandatory minimum sentence of life imprisonment. *Id.* ¶ 20.[6] Specifically, the PSR stated, *id.*: "The statutory mandatory minimum sentence that can be imposed in this case is life imprisonment." With regard to the mandatory minimum sentence in the context of Counts Four and Five, the PSR provided, *id.* ¶¶ 40–42:

> 40. Counts IV and V: Pursuant to 18 U.S.C. § 1512(a)(2)(A), the penalty for the killing of a federal witness is provided for in 18 U.S.C. § 1111. 18 U.S.C. § 1111 states, "Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment' in which event he shall be sentence[d] to imprisonment for life; whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life."
>
> 41. Since the Supreme Court held the discretionary imposition of a death penalty unconstitutional and <u>Furman v. Georgia</u>, 408 U.S. 238, 33 L Ed 2(d) 346, 92 S. Ct. 2726 (1972), defendant's convicted [sic] of first degree murder under § 1111 has been automatically sentenced to life imprisonment. <u>U.S. v. Donley</u>, 878 F.2d 735, 739 n 8 (3d Cir. 1989), Cert. denied 110 S. Ct. 1528, 108 L. Ed. 2d 767 (1990).
>
> 42. The 2nd Circuit in <u>U.S. v. Hector Gonzalez</u>, 922 F2d 1044 (2nd Cir. 1991) Cert. denied, concluded that a sentencing Court has no discretion under § 1111 to impose a sentence other than life imprisonment for first degree murder.

The PSR reviewed Kirkland's prior record. In 1989, he was convicted in the Superior Court for the District of Columbia of attempted possession with intent to distribute cocaine and received a year of probation. *Id.* ¶ 34. He was also charged in New York City with intent to defraud a transit obligation (jumping over a turnstile). *Id.* ¶ 35. And, he failed to appear for the case. *Id.* Kirkland had one criminal history point, which yielded a criminal history category of I. *Id.* ¶ 36.

The PSR said, *id.* ¶ 43:

> Based on an offense level of 50 and a criminal history category of I, the Guideline imprisonment range is life. § 5G1.1 expressly adopts the minimum sentence authorized in a particular statute as the Guideline minimum.

---

[6] Defendant was not eligible for the death penalty. *Id.* ¶¶ 38, 41.

At sentencing on March 9, 1995, Kirkland, who was born in 1969, was 25 years old.  ECF 405 at 1.  In 1964, Kirkland's "mother was declared legally blind . . . and received SSI benefits." *Id.* ¶ 55.  Defendant's parents were never married and never lived together.  *Id.* ¶ 55.  He is the youngest of seven children born to his mother.  As of sentencing, however, he had only three surviving siblings.  *Id*.

Defendant completed the tenth grade and obtained his GED in 1990.  *Id.* ¶ 58.  He denied a history of mental health issues or treatment, and was an occasional user of alcohol and marijuana. *Id.* ¶¶ 56, 57.

The sentencing transcript (ECF 355) reflects a lengthy discussion between counsel and Judge Nickerson regarding Kirkland's offense level.  Judge Nickerson considered the levels in relation to two groups: Group One (Counts One and Two) and Group Two (Counts Three, Four, and Five).

As to the Group One offense level, Judge Nickerson concluded, *id.* at 32: "[T]here is sufficient evidence in the record to support, and I find by a preponderance of the evidence that the amounts that have been calculated and are set out in the Government's memorandum and summarized on page 31 of the memorandum [18.88 kg], reflect accurate and foreseeable amounts of cocaine that are attributable to Mr. [Kirkland] in relation to the conspiracy in which he was convicted under Count I."  This yielded an offense level of 34.  *Id.* at 33.

Further, Judge Nickerson applied a two-level firearm enhancement.  *Id.* at 38.  This increased the offense level to 36.  *Id.*  In addition, Judge Nickerson applied a three-level enhancement based on defendant's role in the offense.  *Id.*  In particular, in Judge Nickerson's "view, the evidence is more than clear and well beyond a preponderance of the evidence that Mr. [Kirkland] was a manager or a supervisor, if not an organizer or leader."  *Id.* at 48.  However,

Judge Nickerson declined to apply an additional enhancement for obstruction of justice in regard to Kirkland's conversations with Personeus. *Id.* at 61–62. Therefore, Kirkland had an offense level of 46 as to Group One. *Id.* at 62. However, Judge Nickerson then found that "the evidence would support a departure under the Application Note under 2A1.1, given Mr. [Kirkland]'s particular role or involvement or lack thereof in the shooting of Tauris Johnson." *Id.* at 77. This led him to "depart down four levels from the 46 to a level 42, which [gave Kirkland] a range of 360 months to life." *Id.*; *see also id.* at 80–81.

As to Group Two, Kirkland's offense level began at 43. *Id.* at 70. Judge Nickerson then added five levels for a multiple count adjustment under § 3D1.4(a). *Id.* at 71.

Kirkland had a criminal history score of 1. *Id.* Judge Nickerson explained: "We are for the moment at a level 48 which is off the chart, category 1, which would indicate life." *Id.* at 72.

Judge Nickerson noted that "with respect to Count III, there is a statutory maximum of five years." *Id.* at 81. The court then turned to the sentences for Counts Four and Five, which related to the murder of witness Latisha Murphy. *Id.*

Of relevance, the jury found that the killing of Murphy was intentional. *Id.* at 84. But, the jury was not asked to determine the degree of the murder. *Id.* Notably, first-degree murder carried a mandatory minimum sentence of life imprisonment, whereas second-degree murder did not. *See id.* at 81–82. At sentencing, the prosecutor argued: "Given the nature of the evidence, I don't think a jury has to make a specific finding under what we have charged." *Id.* at 85. The prosecutor added, *id.*: "Under section 1512 [of 18 U.S.C.] the evidence supports that these individuals were lying in wait."

Judge Nickerson considered whether Kirkland was found guilty of first-degree murder or second-degree murder of Murphy.  He remarked, *id.* at 91: "I do not understand how you can find an intent to kill and make it anything other than first degree."  He concluded, *id.* at 94–95:

> In my view it is not really close.  I think the evidence was more than clear by a preponderance, at least clear and convincing, that Mr. [Kirkland] knew full well what was about to transpire when he pointed Latisha Murphy out to Mr. Dawson, Sr.  Given his overall participation in this conspiracy, his particular role, Mr. Dawson, Sr.'s appearance on the scene for purposes of doing what he did, to infer that his knowledge was anything less than a knowledge and understanding of what was about to happen, is not an inference I can draw.

> So that the request for a departure, as I understand the request with regard to Counts IV and V, I guess it goes III, IV, and V, since they are grouped together is going to be denied. . . . Count III there is a maximum five years under the statute. Counts IV and V are both life sentences.

Kirkland elected to allocute.  At the outset, he said, *id.* at 97: "Your Honor, first of all, I never had a fair trial at all, period."  He criticized the judge and the jury, and also questioned the evidence presented against him.  *Id.* at 97–100.

At the conclusion of the hearing, Judge Nickerson imposed concurrent sentences of 360 months as to Counts One and Two, which corresponded to "the low end of the range . . . . given [defendant's] relative involvement with those."  *Id.* at 101.  Additionally, Judge Nickerson imposed a concurrent sentence of five years as to Count Three.  And, he imposed life imprisonment as to Counts Four and Five, concurrent with the other sentences.  *Id.* at 101–02; *see also* ECF 356 (Judgment) at 2.[7]

---

[7] Kirkland's codefendants also received lengthy sentences.  The government recounted, Govt. Brief at *5 (exhibit citations omitted):

On February 23, 1995, Dawson Sr. was sentenced to 240 months on Count One, 5 years on Count Three, and life terms as to Counts Four and Five, with all terms to be served consecutively. On February 28, Dawson Jr. was sentenced[]to life terms as to Counts One, Two, Four, and Five, and five years on Count Three, with all terms to be served concurrently to each other, and the term on Count One to be

Kirkland noted an appeal to the Fourth Circuit. ECF 419.[8]  On April 21, 1998, the Fourth Circuit affirmed in an unpublished opinion.  *See Dawson*, 1998 WL 188636.

On June 27, 2001, Kirkland filed a Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C § 2255.  ECF 262.  Judge Nickerson denied Kirkland's motion on July 12, 2001.  ECF 264.  Kirkland appealed.  ECF 265.  The Fourth Circuit denied a Certificate of Appealability and dismissed the appeal on November 19, 2001.  *See United States v. Kirkland*, 22 Fed. Appx. 158 (4th Cir. 2001) (per curiam).

Kirkland filed another § 2255 motion on March 14, 2011.  ECF 294.  Judge Nickerson dismissed that motion, without prejudice, on May 10, 2011.  ECF 295, ECF 296.  And, on July 21, 2014, Kirkland filed yet another motion to vacate under 28 U.S.C. § 2255.  ECF 309.  Again, Judge Nickerson dismissed the motion, without prejudice, on July 24, 2014, and denied a Certificate of Appealability.  ECF 310.

On January 25, 2022, Kirkland submitted a request for compassionate release to the Warden of FCI Mendota, where he was then incarcerated.  ECF 338-1 at 2.  The Warden denied his request on February 15, 2022.  *Id.* at 4.  Kirkland's motion for compassionate release followed on November 3, 2022.  ECF 338.

As noted, Kirkland is currently incarcerated at FCI McKean.  ECF 345.  He is now 55 years old (ECF 338 at 6; ECF 354 at 1) and has been incarcerated for more than 30 years.

---

served consecutively to any undischarged term imposed in New York State on a prior drug felony conviction. . . .  Finally, on April 28, 1995, Beverly Brown was sentenced to 135 months on Count [O]ne of the indictment.

[8] I did not locate the notice of appeal on the docket.  However, I found a copy of the notice of appeal in the Chambers file of Judge Nickerson, and I submitted it for docketing.

## II.      Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

18 U.S.C. § 3582(c); *see United States v. Moody*, 115 F.4th 304, 310 (4th Cir. 2024); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. Apr. 18, 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, "commonly known as the 'compassionate release exception.'" *Moody*, 115 F.4th at 310; *see Hargrove*, 30 F.4th at 194; *see also United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (per curiam) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release . . . ."). The provision was first enacted as part of the Sentencing Reform Act of 1984. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Under 18 U.S.C. § 3582(c)(1)(A)(i), a court may modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194.

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-

473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the BOP rarely filed such a motion on an inmate's behalf.  As a result, compassionate release was an infrequent occurrence.  *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

However, with the passage of the First Step Act ("FSA") in 2018, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582, *Malone*, 57 F.4th at 173, by enabling a federal inmate to file a motion for compassionate release directly with the court, as long as the inmate first exhausted administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).  In particular, the FSA authorizes a court to grant compassionate release "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if

two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. Specifically, "the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.

The first step actually consists of two parts. The court "must determine: 1) whether extraordinary and compelling reasons warrant . . . a [sentence] reduction; and 2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Malone*, 57 F.4th at 173; *see Moody*, 115 F.4th at 310; *Davis*, 99 F.4th at 653; *Bond*, 56 F.4th at 383; *Bethea*, 54 F.4th at 831; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).

If that first step is met, the court then proceeds to the second step. Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see Moody*, 115 F.4th at 310; *Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330. "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman*, 2024 WL 3633573, at *4 (citations omitted) (alteration in *Osman*).

As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 653–54; *see also Malone*, 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and compelling reasons

14

warrant a sentence reduction and that a reduction is consistent with the Sentencing Commission's policy statements); 28 U.S.C. § 994(t).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners. *Davis*, 99 F.4th at 654; *see McCoy*, 781 F.3d at 281. The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021) (emphasis added). Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 281, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted).

However, effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon

motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is now applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction"). As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
>> (1) (A) extraordinary and compelling reasons warrant the reduction; or
>>
>> (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS." It identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as a terminal illness, "serious

cognitive impairment," a medical condition that requires "specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency . . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors, § 1B1.13(b)(2); the defendant's family circumstances, § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, § 1B1.13(b)(4)(A), (B); for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed . . . .", § 1B1.13(b)(6); and "any other circumstance or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." § 1B1.13(b)(5).

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c). "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 99 F.4th at 654.[9]

---

[9] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its]

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant.  It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence.  The Section provides that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  U.S.S.G. § 1B1.13(d).  However, "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*[10]  And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district

---

discretion to reduce a sentence pursuant to the First Step Act."  *Id.* at 500.  However, the Court acknowledged that "Congress or the Constitution [may] limit[] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence . . . ."  *Id.* at 486.  "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements."  *Id.* at 495.  It follows that, because the Policy Statement is now applicable to prisoner-filed motions for compassionate release, a court may consider intervening changes of law only in the manner that the Policy Statement prescribes.

[10] The Court is mindful that defendant filed his Motion before November 1, 2023, when the amendment to U.S.S.G. § 1B1.13 went into effect.  But, even if the Court had decided this case prior to the amendment, the outcome would have been the same.

18

court enjoys broad discretion in conducting this analysis); *United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors, to the extent applicable, in exercising its discretion); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).  Notably, the amendments to the Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'"  *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).  As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500).  The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor."  *Davis*, 99 F.4th at 656; *see United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said:  "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a § 3553(a) analysis."  But, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).  In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190).  And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).  And, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant

actually received and the sentence he would receive, if sentenced under current law.  *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.").  In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . . " *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

*Davis*, 99 F.4th 647, is illustrative.  The *Davis* Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6).  *Id.* at 654, 655.  And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range."  *Id.* at 661.  According to the Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison."  *Id.*  The Court stated, *id.*:  "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'"  *Id.* (quoting 18 U.S.C. § 3553(a)(6)).  The Court concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial."  *Davis*, 99 F.4th at 661 (*citing Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)).

## III.  Discussion

Kirkland argues that: (1) COVID-19, (2) changes in the law, (3) his age, and (4) his post-conviction rehabilitation constitute an "extraordinary and compelling" basis for his release.  ECF

338 at 1.  He also states, *id.* at 9: "Requiring Kirkland to die in jail is 'greater than necessary to serve the purposes' of 18 U.S.C. § 3553(a)(2)."  (Capitals altered).

The government opposes the Motion.  ECF 343.  In its view, "none" of the grounds Kirkland has provided "is sufficient."  *Id.* at 1.  Moreover, the government contends that Kirkland "has failed to demonstrate the [§] 3553(a) factors militate in favor of release."  *Id.* at 10.

### A.  COVID-19[11]

Kirkland explains that he suffered "from countless severe medical conditions during the heart of a [COVID-19] pandemic outbreak."  ECF 338 at 7.  But, Kirkland does not identify any of the medical conditions, nor did he provide medical records, other than his COVID-19 vaccination records.  ECF 338-1.  Further, as of November 2022, when Kirkland filed his Motion, he claimed that "the BOP [was] not providing its normally scheduled classes and programs," and thus his continued "incarcerat[ion] during COVID-19 would hinder the goals of educational training, medical care, or other treatment in the most effective manner."  ECF 338 at 15.

The government counters that "while Kirkland complains about COVID, he cites no medical condition specific to himself that might make him more susceptible" to severe illness due to COVID-19, nor did he provide medical records.  ECF 343 at 2; *see also id.* at 9.[12]  Further, the government argues that even if Kirkland has a severe medical condition, he "has now been vaccinated, which dramatically undermines any claim that his continued incarceration presents an

---

[11] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

[12] The Court notes that the government often obtains and submits a defendant's medical records.

extraordinary circumstance based on a potential exposure to COVID."[13]  *Id.* at 2; *see also id.* at 9. And, the government asserts, *id.* at 9: "Courts have made clear that defendants cannot claim potential exposure to COVID-19 in the prison setting is an 'extraordinary and compelling' circumstance when said defendant has been vaccinated."

The Centers for Disease Control and Prevention ("CDC") has provided an extensive list of medical conditions that could exacerbate a COVID-19 infection.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.  These include comorbidities such as cancer, chronic kidney disease, chronic liver disease, chronic lung diseases, cystic fibrosis, dementia or other neurological conditions, diabetes (type 1 or type 2), heart conditions, HIV infection, immunocompromised condition or weakened immune system, mental health conditions, obesity, physical inactivity, pregnancy, sickle cell disease or thalassemia, smoking, solid organ or blood stem cell transplant, stroke or cerebrovascular disease, substance abuse disorders, tuberculosis, disabilities such as one that "makes it more difficult to do certain activities or interact with the world around them," cerebral palsy, birth defects, attention-deficit/hyperactivity disorder, intellectual and developmental disabilities, learning disabilities, spinal cord injuries, and people with Down syndrome.  Defendant does not claim to have any of these conditions.

---

[13]  I disagree with the government that because Kirkland has received the COVID-19 vaccination, this "dramatically undermines any claim that his continued incarceration presents an extraordinary circumstance based on a potential exposure to COVID."  ECF 343 at 2; *see also id.* at 9.  The protection derived from the vaccine does not appear to last indefinitely.  Moreover, the virus has gone through many variants, which affects the efficacy of a given vaccine.  As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

In *Brown*, 78 F.4th 122, the Fourth Circuit explained that, "[t]o establish that the risk posed by COVID-19 presents an 'extraordinary and compelling reason' for release, a defendant must allege 'that the risk of contracting COVID-19 in a prison is higher than the risk outside the prison and that [his] preexisting medical condition increases [his] risk of experiencing a serious, or even fatal, case of COVID-19.'"  *Id.* at 128 (quoting *High*, 997 F.3d at 185).  Further, the *Brown* Court explained that although "this 'inquiry is multifaceted and must account for the totality of the relevant circumstances,' courts within the Fourth Circuit have looked to whether 'an inmate shows both a particularized susceptibility to COVID-19 and a particularized risk of contracting the disease at his prison facility.'"  *Id.* (citations and some quotation marks omitted).

Kirkland has failed to present evidence that he suffers from any medical condition.  Indeed, Kirkland presents no explanation or documentation supporting his claim that he "suffer[s] from countless severe medical issues."  ECF 338 at 7.

Moreover, the fear of COVID-19 does not constitute an extraordinary and compelling circumstance that warrants an inmate's release. "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . . , generalized and unspecific reasons . . . do not satisfy the

standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).

### B.  Changes in Sentencing Law

In his pro se submission, Kirkland argues that the First Step Act "authorize[s] courts to reduce the prison term – even to time served – of any defendant if it finds that 'extraordinary and compelling reasons' warrant such a reduction."  ECF 338 at 4.  He cites, *inter alia*, *United States v. Cantu-Rivera*, H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019), as one example.  ECF 338 at 5.  In that case, the court reduced the defendant's life sentence to time served, *i.e.*, 30 years, based on the defendant's rehabilitation and extensive educational achievements.  *Id.*

Further, Kirkland contends, *id.* at 17–18: "If sentenced today, [defendant] would not face a statutory mandatory minimum sentence of life."  In his Reply (ECF 344), Kirkland adds, *id.* at 9: "Defendant Kirkland's sentence was a product of the then-mandatory Sentencing Guidelines and under today's sentencing scheme, the Court would not have the authority to give him such a long and harsh sentence."

Additionally, Kirkland cites numerous cases in which compassionate release was granted for defendants who had "served a significant portion of their sentences."  ECF 338 at 9–10.  He also maintains that "defendants whose conduct is similar or worse than Kirkland's who have committed murder, drug trafficking, racketeering, shootings, or even terrorism offenses, routinely receive *far* less than life without parole sentences."  ECF 344 at 10–13 (emphasis in original).  He states: "As Judge Blake recently observed, the average federal sentence for murder has declined in recent years."  ECF 338 at 13 (citing *United States v. Bryant*, CCB-94-202, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020)); *see also* ECF 344 at 6–7.  In defendant's view, reducing his sentence "would further the avoidance of unwarranted sentencing disparities," which he claims

25

disproportionately affect people of color.  ECF 338 at 14–15.  And, he maintains that the sentence he has already served is sufficient to provide just punishment and promote respect for the law.  *Id.* at 9.

Moreover, Kirkland posits that the judge and the jury made errors during his trial and at sentencing.  To illustrate, he points to errors as to his "CCE violation," *i.e.*, continuing criminal enterprise, under 21 U.S.C. § 848.  *Id.* at 8.  Kirkland argues that findings that had to be made by a jury were instead made by the judge.  Further, he contends that "the jury had to find proof of a continuing criminal enterprise or a violation of a § 841(b)(1)(A) or § 960(b)(1)."  *Id.* (citing 21 U.S.C. § 848(E)(1)(A)).  In addition, he complains that "the jury came back with a general verdict.  Thus, it was the Judge and not the jury that found that 18 U.S.C. § 1111 applied in this case."  *Id.*

Defendant also contends that the punishment for conspiracy to commit murder "is capped at 10-years, not life."  *Id.* at 18.  Thus, he claims that the court erred because it "assigned USSG § 2A1.1, first degree murder, as the guideline for the underlying crimes charge [sic], the conspiracy to murder, but should have assigned [U.S.S.G.] § 2A1.5."  *Id.* at 18 (alteration in original).

In addition, Kirkland argues that, in light of *Arthur Anderson LLP v. United States*, 544 U.S. 696 (2005), and *Fowler v. United States*, 563 U.S. 668 (2011), he would receive "a lower sentence today or a claim of actual innocent [sic]."  *Id.* at 20.  He reasons that these cases "limited the scope of the witness tampering statute and have rendered non-criminal the acts for which he was convicted."  *Id.*

In the supplement submitted by defendant's attorney (ECF 403), counsel argues that "an unusually long sentence may constitute an extraordinary and compelling reason for compassionate release when (1) the defendant has already served at least 10 years in prison, (2) a change in the law (other than a non-retroactive Sentencing Guidelines amendment) 'would produce a gross

disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed,' and (3) the Court has given "full consideration [to] the defendant's individualized circumstances." *Id.* at 8–9 (citing U.S.S.G. § 1B1.13(b)(6)). Noting that Kirkland has served more than 30 years in prison, the defense observes that this is well above "the 10-year requirement," *id.* at 9; the change in law "is that the sentencing guidelines are no longer binding, but advisory," *id.* at 10; and he points to Kirkland's "young age at the time of his charges." *Id.*

Kirkland's counsel posits that because the sentencing Guidelines are now advisory, rather than mandatory, "the Court could vary its sentence of incarceration downward from life if it were sentencing Mr. Kirkland today." *Id.* at 10. Moreover, Kirkland's counsel contends that "[t]oday, in the District of Maryland, a mandatory life sentence is the exception and at odds with the sentence Mr. Kirkland received." *Id.* at 15.

Citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), Kirkland's counsel also contends that, "[i]f this same fact pattern were to appear before a court today, a jury would have to make the factual finding of whether Mr. Kirkland's involvement in Ms. Murphy's death was premeditated and deliberated." *Id.* at 17. He adds, *id.*: "Judge Nickerson's factual finding under the preponderance of evidence standard of Mr. Kirkland's 'premeditation' resulted in the imposition of a mandatory minimum life sentence for first degree murder under § 1111. Today, it is far more likely that Mr. Kirkland would not be subjected to a mandatory minimum life sentence. That disparity is an extraordinary and compelling reason which qualifies Mr. Kirkland for compassionate release."

The government acknowledges that "there is a change in the law that makes the guidelines now advisory." ECF 412 at 4. But, it asserts that "the guidelines range itself is still the same." *Id.*

Thus, the government concludes that this case does not present a sentencing disparity, "much less a 'gross disparity.'" *Id.*

Moreover, the government observes that "the Fourth Circuit has recently clarified that post-sentencing changes in the law do not satisfy the 'extraordinary and compelling' standards required by 28 U.S.C. § 3582(c)(1)(A) because allowing such claims would permit defendants to end-run the strictures in 28 U.S.C. § 2255." ECF 343 at 2 (citing *United States v. Ferguson*, 55 F.4th 262 (4th Cir. 2022)). It maintains that "'a compassionate release motion cannot be used to challenge the validity of a defendant's conviction or sentence.'" ECF 343 at 8 (quoting *Ferguson*, 44 F.4th at 272). The government explains: "'Because § 2255 is the exclusive method of collaterally attacking a federal conviction or sentence, a criminal defendant is foreclosed from the use of another mechanism, such as compassionate release, to sidestep § 2255's requirements.'" ECF 343 at 8 (quoting *Ferguson*, 44. F.4th at 270) (alteration in ECF 343 omitted).

According to the government, Kirkland's arguments constitute a collateral attack on "a challenge to the validity of the prior sentence that had been imposed," a position rejected in *Ferguson*. ECF 343 at 8. It asserts, *id.*: "Just like the defendant in *Ferguson*, Kirkland is raising non-medical claims that seek to collaterally attack his sentence on the ground that he might not have gotten a life sentence were he tried and sentenced today." The government urges the Court not to permit an "end-run" around "the successive habeas bar by using a compassionate release vehicle to raise the very same claims that would generally be barred on habeas." *Id.* at 9.

To be sure, at the time of defendant's sentencing in 1995, the Guidelines were mandatory, not advisory. A decade later, the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), declaring unconstitutional the provision of the federal sentencing statute that made the

Guidelines mandatory. *Id.* at 245; *see Rita v. United States*, 551 U.S. 338, 361–62 (2007). The shift from mandatory Guidelines to advisory Guidelines constituted a sea change in the law.

Although the Guidelines are now advisory, the role of the Guidelines in sentencing remains significant. The United States Sentencing Commission is an agency that "Congress has tasked with promulgating 'guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case.'" *United States v. Furlow*, 928 F.3d 311, 314 n.1 (4th Cir. 2019) (quoting 28 U.S.C. § 994(a)(1)), *vacated on other grounds*, __ U.S. __, 140 S. Ct. 2824 (2020). The Guidelines are the "foundation of federal sentencing decisions." *Hughes v. United States*, 584 U.S. 675, 685 (2018). Indeed, the sentencing Guidelines have been described as "the lodestone of sentencing," *Peugh v. United States*, 569 U.S. 530, 544 (2013), and the "starting point" in the task of a judge to fashion a reasonable sentence. *Freeman v. United States*, 564 U.S. 522, 529 (2011); *see Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016).

Effective November 1, 2023, the Guidelines were amended. U.S.S.G. § 1B1.13(b)(6) is pertinent. It provides (emphasis added):

> **If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment**, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(c), titled "Limitation on Changes in Law," it also noteworthy. It provides: "Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."

Kirkland satisfies the criteria of § 1B1.13(b)(6).  As his attorney argues, he received a sentence of life imprisonment; he has served thirty years of imprisonment; and the change in the law as to the Guidelines, from mandatory to advisory, is a circumstance that I may consider.

Prior to the amendments of November 1, 2023, in regard to motions for compassionate release, many judges in this District considered a change in the sentencing law landscape that a defendant would face if prosecuted today.  *See, e.g.*, *United States v. Chandler*, GLR-05-0181, ECF 119 at 1–2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 981 F.3d 271; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).  Judge Richard Bennett of this Court has said: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'"  *United States v. Johnson*, RDB-07-0153, ECF 183 at 10–11 (D. Md. Oct. 14, 2020); s*ee also McCoy*, 981 F.3d at 285.  Although these cases predated the amendments of November 1, 2023, the cases remain informative.

To be clear, the calculation of the Guidelines has not changed with respect to Counts Four and Five.  However, the Guidelines are now strictly advisory.  And, there are many instances when defendants expligible for life sentences under the Guidelines do not receive such a sentence.

Nevertheless, there is an important distinction between the Guidelines, which are merely advisory, and statutes that are mandatory.  Here, as to Counts Four and Five, defendant received

mandatory life sentences, as required by statute.  And, there has been no change in the statute as to the mandatory sentence for first-degree murder under 18 U.S.C. § 1512 and 18 U.S.C. § 1111. Thus, the Guidelines argument in this case is largely a red herring as to Counts Four and Five.

In contrast, defendant's *Apprendi* contention is significant.  Defendant was convicted of Count Four, aiding and abetting the killing of a federal witness (Murphy) to prevent her attendance or testimony at an official proceeding, *i.e.*, trial, in violation of 18 U.S.C. § 1512(a)(1)(A).  He was also convicted of Count Five, aiding and abetting the killing of Murphy to prevent her communication with law enforcement officials or a judge, in violation of 18 U.S.C. § 1512(a)(1)(C).  ECF 354 at 1; *see also* Gov't. Brief at **3–4.  As noted, punishment for violation of both subsections in the case of a killing is found under 18 U.S.C. § 1512(a)(3)(A), which then pointed to the punishment provided in 18 U.S.C. § 1111 and § 1112.  Section 1111(a) defines first-degree murder versus second-degree murder; 18 U.S.C. § 1111(b) states that first-degree murder is punishable by death or a term of life imprisonment, and second-degree murder is punishable by imprisonment "for any term of years or for life."

Of import, the jury was not asked to determine whether defendant was guilty of first-degree or second-degree murder.  Judge Nickerson's determination was not an adequate substitute for the jury's determination.

In *Jones v. United States*, 526 U.S. 227 (1999), the Supreme Court said: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 243 n.6.  In *Apprendi*, 530 U.S. at 476, the Court expanded this principle to cases involving state statutes, stating: "The Fourteenth Amendment commands the same answer in this case."  And, in

*Alleyne v. United States*, 570 U.S. 99 (2013), the Court stated that "the principle applied in *Apprendi* applies with equal force to facts increasing the mandatory minimum." *Id.* at 111–12.

The Supreme Court's decisions in *Apprendi* and *Alleyne* establish a change in law that is pertinent here. *See, e.g.*, *United States v. Clowers*, No. 5:92-CR-00082-TES-CHW-2, 2024 WL 3461752, at *5 (M.D. Ga. July 18, 2024) ("Today, under *Alleyne*, any finding of a specific drug quantity that would mandate any increase in a mandatory minimum sentence must be made by a jury—that would certainly seem to qualify as a change in the law."); *United States v. Parson*, No. 9:95-cr-08089 (S.D. Fla. Apr. 19, 2024), ECF No. 1905 at 9 ("At the time Defendants were tried, treating the drug quantity as a sentencing factor rather than an element of the offense requiring a jury verdict was not error—*Apprendi* thus *changed* the law by making it so.") (italics in original).

In *United States v. Parson*, for example, the defendants were subject to statutory mandatory minimums of life imprisonment under 21 U.S.C. § 841(b), and were sentenced accordingly. *Parson*, ECF 1905 at 1–2. In their motions for compassionate release, the defendants contended that, "considering *Apprendi*, the maximum sentence they could receive without a separate jury finding on drug quantity was 20–30 years," and instead they received a sentence of life imprisonment. *Id.* at 9. In considering the motions, the court concluded that, "given the changes to the . . . standards of proof in *Apprendi*, and the discretion given to sentencing judges in *Booker*, Defendants could have received sentences shorter than life imprisonment had they been sentenced at the time they filed their Motions." *Id.* at 10.

*United States v. Clowers*, 2024 WL 3461752, at *1, is also instructive. There, the defendant was convicted of various offenses in connection with a crack cocaine trafficking conspiracy. He was subject to a statutory mandatory minimum sentence of life imprisonment under 21 U.S.C. § 848(a), and he was sentenced accordingly. *Id.* At sentencing, the judge "made a finding as to

the quantity of drugs based on evidence provided by the case agent at Clowers' sentencing hearing, and no jury ever passed on the question." *Id*. at *5. In considering a motion for compassionate release, the court said: "Here, the intervening change of law rests with the Sixth Amendment right to a jury finding of any fact that increases a mandatory minimum sentence." *Id*. If the court were sentencing the defendant today, it "would only be faced with sentencing him to the statutory minimum of 20 years under 21 U.S.C. § 848(a)." The court added that "the drug quantity finding by the judge, which would now be found unconstitutional under *Alleyne*, raised his mandatory minimum from a 20-year sentence to one for life. This is a disparity that is glaringly noticeable." *Id.*

As stated, in Kirkland's case, the jury found that the killing of Murphy was intentional. But, the jury was not asked to determine the degree of the murder. ECF 355 at 84. At sentencing, Judge Nickerson found that Kirkland's conduct amounted to first-degree murder. Therefore, life sentences as to Counts Four and Five were mandatory. But, following *Apprendi* and *Alleyne*, without a jury finding of first-degree murder, Kirkland would be subject to the sentence prescribed under 18 U.S.C. § 1111(b) for second-degree murder, which is imprisonment "for any term of years or for life." For second-degree murder, a life sentence was not compulsory.

Kirkland's counsel also argues: "On the facts of Mr. Kirkland'[s] case and considering his young age at the time of his charges, it is likely that the Court would find concurrent life sentences excessive, given intervening changes in the law and other considerations." ECF 403 at 10. To support this argument, the defense cites *Miller v. Alabama*, 567 U.S. 460, 464 (2012), a case in which the Supreme Court held that it was unconstitutional to impose a mandatory life sentence for a juvenile defender. *Id*. at 11. Indeed, he contends that "[a]t the time of his offenses, Mr. Kirkland was an immature young adult caught up in a life of fast living." *Id*. at 12–13. Although many of

the circumstances of the childhood Kirkland describes are unfortunate, *see id*. at 12–13, 26, he was not a juvenile at the time of sentencing.  *See* ECF 354 at 1.  He was already 25 years old.  *Id*.[14]

Defendant argues that his life sentence appears to be longer than federal sentences imposed more recently for drug offenses involving violence.  This assertion is supported by statistics compiled by the United States Sentencing Commission.  For example, for fiscal year 2022, the average national sentence imposed for drug trafficking was 78 months (6 years, 6 months); for murder, 261 months (21 years, 9 months); for firearms, 49 months (4 years, 1 month); and for kidnapping, 184 months (15 years, 4 months).  *Table 15, "Sentence Imposed by Type of Crime,"* at 64, in *2022 Annual Report and Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, https://perma.cc/JJ54-A9PC   ("2022 Sourcebook"); *see also United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)).

The case of *United States v. Floyd*, CCB-16-597, is informative.  Floyd was one of several defendants convicted after a 25-day trial. *See id*., ECF 477; ECF 491.  In particular, Floyd was convicted of a racketeering conspiracy that included murders and drug conspiracy.  Floyd was not the shooter, however.  Although his offense level and criminal history category called for a life sentence, Judge Catherine Blake imposed a total sentence of 360 months of imprisonment.  *Id*.,

---

[14] I do not know whether Judge Nickerson would have opted to impose a sentence other than life imprisonment if permitted to do so.  But, at sentencing as to codefendant Dawson, Jr., Judge Nickerson made clear that he believed a life sentence was appropriate, even though Dawson, Jr. did not fire the shots that led to the deaths of Johnson and Murphy.  Indeed, Judge Nickerson described Dawson, Jr.'s life sentence as "unfortunately lenient," because "it is the most that can be imposed by law."  *See* Michael James, "Dealer Guilty in 2 Deaths Handed 4 Life Sentences," BALTIMORE SUN (Feb. 25, 1995), https://perma.cc/7UZD-Z9TK.

ECF 691.

In *United States v. Antoine*, PWG-19-140, a multi-defendant case, Antoine was involved in a drug trafficking organization in Baltimore. He confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy. *See id.*, ECF 349 (Plea Agreement) at 9–10. Pursuant to a plea agreement under Fed. R. Crim. P. 11(c)(1)(C), Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and (j). *Id.* Although the defendant was the person who shot the victim in the head (ECF 349 at 9), the government agreed to a term of imprisonment ranging between twenty and twenty-five years. *Id.* at 6. Antoine was twenty-five years old at sentencing. *Id.*, ECF 463 (PSR), at 3. Judge Grimm sentenced him to a total term of 270 months of imprisonment, *i.e.*, twenty-two and a half years. *Id.*, ECF 465 (Judgment).[15]

The case of *United States v. Blake*, ELH-06-394, is also instructive.[16] The defendant was convicted of carjacking resulting in death; conspiracy to possess a firearm in furtherance of a crime of violence; possession of a firearm in furtherance of a crime of violence; and murder resulting from possession of a firearm in furtherance of a crime of violence. *See id.*, ECF 62 (Judgment). In particular, a victim was murdered in the course of a carjacking in which the defendant was a participant, which occurred when he was seventeen years old. *See id.*, ECF 123 at 3; *id.*, ECF 149 at 2. The defendant was originally sentenced to life imprisonment. *Id.*, ECF 62. But, his sentence was reduced to 40 years of imprisonment, pursuant to a joint motion by the government and the

---

[15] In contrast, Kirkland went to trial; he did not admit to guilt and was not remorseful at sentencing.

[16] This case was also originally assigned to Judge Nickerson. It was reassigned to me on January 29, 2016, due to the retirement of Judge Nickerson. *See* Docket.

defendant in connection with the defendant's petition under 28 U.S.C. § 2255.  *Id.*, ECF 123, ECF 127.  Then, the sentence was reduced again, to 30 years of imprisonment, pursuant to a joint motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  *Id.,* ECF 165, ECF 168.

In *United States v. Warren, et al.*, JKB-22-439, a multi-defendant case, Warren was a member of the Black Guerilla Family and participated in their affairs "through a pattern of racketeering activity that included conspiracy to distribute controlled substances, possession with intent to distribute controlled substances, robbery and murder."  *See id.*, ECF 271-1 at 1.  Pursuant to a plea agreement, Warren entered a plea of guilty to one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).  *Id.*, ECF 271 at 1.  The pattern of racketeering activity included a conspiracy to murder five individuals.  *Id.* at 2.  The parties jointly agreed that a sentence of 396 months imprisonment would be an appropriate disposition of the case.  *See id.* at 6.  The defendant was thirty-two years old at sentencing.  *Id.*, ECF 290 (PSR), at 3.  Judge Bredar sentenced him to a term of 467 months of imprisonment, *i.e.*, thirty-eight years and eleven months.  *Id.*, ECF 292 (Judgment).

In *United States v. Whisonant, et al.*, ELH-17-191, three defendants pleaded guilty to conspiracy to distribute heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime, or to possession of a firearm in furtherance of a drug trafficking crime.  The murder was unexpectedly captured, in real time, during an authorized wiretap.  One defendant received a total sentence of 360 months imprisonment (*id.*, ECF 180), another received a sentence of 420 months (*id.*, ECF 163), and still another received a sentence of 480 months of incarceration.  *See id.*, ECF 184.  The sentence of 360 months was subsequently reduced to 295 months by Order of June 26, 2023, pursuant to § 3582(c)(1)(A)(i).  *See* ECF 335.

In *McCoy*, 981 F.3d 271, the Fourth Circuit recognized that "the dramatic degree to which [a defendant's sentence] exceed[s] what Congress now deems appropriate" can provide an extraordinary and compelling reason for a reduction in sentence. *Id.* at 288.  The defendants in the cases consolidated for appeal in *McCoy* were convicted of robberies and firearms violations under 18 U.S.C. § 924(c).  *Id.* at 274.  At the time of their convictions, under the practice known as "stacking," a conviction under 18 U.S.C. § 924(c) "was treated as 'second or subsequent,' triggering [a] 25-year minimum sentence, even if the first § 924(c) conviction was obtained in the same case."  *Id.* at 275.  After enactment of the First Step Act, however, "the 25-year mandatory minimum applie[d] only when a prior § 924(c) conviction ar[ose] from a separate case and already . . . bec[a]me final."  *Id.* (citation and internal quotation marks omitted).  But, the change was not retroactive.

The district courts in *McCoy* granted sentence reductions in part on the basis that, under current law, the defendants would have received sentences significantly less severe than their "stacked" sentences.  *Id.* at 274–75.  The Fourth Circuit affirmed, holding that "courts legitimately may consider, under the 'extraordinary and compelling reasons' inquiry, that defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair."  *Id.* at 285–86.

Based on *McCoy*, 981 F.3d at 285–86, Judge Blake of this Court explained in *United States v. Myers*, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021), that a court evaluating a motion for sentence reduction based on a sentencing disparity should consider: (1) whether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is "dramatically longer than necessary or fair;" (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently

imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and their post-sentencing conduct in the BOP.

More recently, in *Brown*, 78 F.4th 122, the Fourth Circuit reaffirmed that a defendant's disparate sentence "is relevant to both the 'extraordinary and compelling reasons' inquiry and the § 3553(a) factors." *Id.* at 130. Indeed, the Court determined that the district court in that case erred in its compassionate release analysis by failing to consider a defendant's disparate sentence. *Id.* at 130–31. In the Court's view, two features of the sentence it was reviewing provided extraordinary and compelling reasons for relief: the sentence's "sheer and unusual length" in relation to sentences for more serious and violent crimes, and "the gross disparity between" the sentence "and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* at 131.

In my view, the change in sentencing law since the time of Kirkland's sentencing constitutes an "extraordinary and compelling" circumstance, and the shift in sentencing when life imprisonment is an option, provide a basis for a sentence reduction. *Cf. United States v. Van Putten*, ___ F. Supp. 3d ___, 2024 WL 1332024 (S.D.N.Y. Mar. 27, 2024) (stating that a sentencing court's mistaken belief in the frequency of life sentences for murder during a drug conspiracy is material and "of serious gravity," and constitutes an extraordinary and compelling reason for compassionate release; life sentence reduced to thirty years).

Considering that, today, any term of years would be the relevant mandatory sentence, as well as recent, more lenient sentences given by courts for similar conduct, a sentence of life imprisonment is grossly disproportionate. *See, e.g.*, *Clowers*, 2024 WL 3461752, at *5 ("Thus, this Court finds that a difference of a 20-year minimum sentence and a mandatory life sentence is

38

a gross disparity, especially when one recalls that Clowers was only 21 years old when he was sentenced to life in prison.").  Thus, Kirkland also establishes an "extraordinary and compelling" basis for a sentence reduction.

### C. The 3553(a) Factors

Even if a defendant has identified an "extraordinary and compelling reason" for relief, this does not end the inquiry.  The Court must also consider whether the sentencing factors under 18 U.S.C. § 3553(a) warrant a sentence reduction.  *See Brown*, 78 F.4th at 128; 18 U.S.C. § 3582(c)(1)(A).

The applicable factors in § 3553(a) include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Kirkland argues that his age places him at a reduced risk of recidivism (ECF 338 at 7); he has been sufficiently rehabilitated (*id.*); and he no longer poses a danger to society.  *Id.* at 2.  The government counters that, "even if [defendant] could prevail on the 'extraordinary and compelling' prong, Kirkland's motion still fails under the 3553(a) factors."  ECF 343 at 11.

#### 1.  Kirkland's Age

As noted, Kirkland argues that his age of 55 places him at a low risk of recidivism.  ECF 338 at 7.  He explains that, "[a]s age increases, recidivism by every measure decrease[s]."  *Id.* to support his position, defendant cites United States Sentencing Commission data.  *Id.*  In reply, Kirkland again cites to statistics, claiming that "defendants released in their 50's pose little to no

danger to the community and the recidivism rate of those defendants is very, very low." ECF 344 at 6–7.

The government argues that Kirkland's "age alone does not qualify him for release." ECF 343 at 2. Further, the government argues that "[s]everal courts have made clear that age alone— without any comorbidities that might come with the aging process—does not rise to the level of extraordinary and compelling." *Id.* at 6. And, the government claims that the Guidelines do not consider age-related release until the age of 65, and then only when there are related health issues. *Id.* at 7. Thus, the government asserts: "Because Kirkland provides no medical ailments that might be associated with his age, but instead seems to stand on his age . . . alone, this Court must reject his age as a potential ground for release." *Id.*

"Recent analysis from the Bureau of Justice Statistics considering the recidivism rates of released prisoners in 30 states (including [Maryland]) from 2005 to 2010 supported the Commission's conclusion, finding decreased recidivism rates as prisoners age.[ ]" *United States v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014) (emphasis added); United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* (April 2014), at 12, https://perma.cc/ZE9K-QD9U; *see also United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("[S]tudies demonstrate that the risk of recidivism is inversely related to an inmate's age."). Those aged 40 years or older seem to have the lowest recidivism rates. *See Recidivism of Prisoners Released in 30 States in 2005*, *supra*, at 12, https://perma.cc/ZE9K-QD9U.

Moreover, district courts in the Fourth Circuit have considered a defendant's age as it relates to recidivism when balancing the § 3553(a) factors in regard to a motion for compassionate release. *See, e.g.*, *United States v. Hill*, 2023 WL 35211, at *9 (E.D. Va. Jan. 4, 2023) (age 59);

*United States v. Mills*, DCN-97-815, DCN-98-786, 2022 WL 206074, at *6 (D.S.C. Jan. 24, 2022) (age 57); *United States v. Epstein*, JKB-17-453, 2020 WL 4339325, at *2 (D. Md. July 28, 2020) (age 60).  Defendant has gone from a young man to middle aged, as he is now 55 years old.  ECF 338 at 6; ECF 354 at 1.  That said, the defendant's age does not warrant compassionate release.

### 2.  Rehabilitation

Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019); *Kibble*, 992 F.3d at 334 n.3.  Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture" of a defendant's "'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  The court must "at least weigh the [defendant's] conduct in the years since the[] initial sentencing[]." *McDonald*, 986 F.3d at 412; *see Martin,* 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts).

Rehabilitation efforts should be considered in regard to a motion for compassionate release. *See United States v. Lancaster*, 997 F.3d 171, 175 (2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410–12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying

motion under the First Step Act without addressing defendant's post-sentencing conduct).
However, "rehabilitation alone cannot constitute an extraordinary and compelling reason for
release." *United States v. Davis*, No. 21-6960, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022).

Kirkland argues that he is fully rehabilitated and that he "is not a danger to the community."
ECF 338 at 6. Moreover, he claims that he "has accepted responsibility for his crime and expressed
explicit and repeated remorse." *Id.* at 7. Specifically, defendant claims, *id.*:

> Kirkland[,] although he plead [sic] not guilty during his trial, does not deny the
> 'factual guilt' found in his conviction. There is no denial of the underlying offense.
> It is really a question of "acceptance of responsibility" and that Kirkland has shown,
> evidenced by this record and those presents presented [sic] herein, that Kirkland
> has matured and developed healthy ideals, an awareness as the result of his actions
> on society and a deep-felt remorse for his actions in the instant offense.

Defendant argues that "the goals of sentencing have been met by [his] nearly three decades
in prison and are no longer being met through imprisoning him during the COVID-19 pandemic
and until his death." *Id.* at 15. Further, Kirkland contends that "requiring [him] to die in jail is
'greater than necessary to serve the purposes' of 18 U.S.C. § 3553(a)(2)." *Id.* at 9 (capitalization
removed).

Yet, defendant continues to cast blame on others for what occurred. Kirkland's repeated
arguments throughout his Motion and Reply, stating that both his guilty verdict and the sentence
were the product of legal errors, undercut his claims of remorse and rehabilitation. ECF 338 at 8–
9; *id.* at 20. Indeed, with little explanation, Kirkland argues that his sentence is "unconstitutional."
*Id.* at 9. This begs the question whether defendant has, indeed, accepted responsibility for his
conduct, and whether he is ready to conform his conduct to societal expectations. *See United States
v. Casteel*, 483 F. Supp. 3d 642, 644 (S.D. Iowa 2020) ("Defendant's lack of remorse raises doubts
about whether he 'respect[s] the law,' § 3553(a)(2)(A), and received sufficient 'deterrence,'

§ 3553(a)(2)(B). This, in turn, suggests the public may not be protected sufficiently should he be released. § 3553(a)(2)(C)."), *aff'd*, 2020 WL 9047238 (8th Cir. Oct. 5, 2020).

The government acknowledges some of the factors in Kirkland's favor.  *See* ECF 412 at 7. For example, the government agrees "that Kirkland's service of 30 years in prison has addressed the need for specific deterrence" and that his "childhood circumstances as described in his supplemental brief are mitigating."  *Id*.  But, the government also points to the seriousness of the underlying offenses.  It underscores that defendant's "conduct in the conspiracy led to the deaths of two people," ECF 343 at 2, and the government maintains that defendant displayed "a callous disregard for life . . . ."  *Id.* at 12.  In particular, the government cites "the murder of a 10 year old boy, and a potential federal witness."  *Id.* at 11.  In addition, the government claims that Kirkland was "the chief lieutenant of Dawson, who was the leader of a large-scale drug trafficking ring." *Id.*  It states, *id.*: "In order to properly account for the seriousness of [defendant's] crimes and the need to justly punish [the defendant] in conformity with the will of Congress, the defendant should not be released; rather, he should serve his life sentence."

In the government's view, Kirkland's Motion "is nothing more than a naked request for judicial parole" which "has been abolished in the federal system."  *Id.* at 3; *see also id.* at 12–13. As the government puts it, the Court "cannot use compassionate release to resurrect a parole system that Congress abolished."  *Id.* at 12.  Additionally, the government argues that releasing Kirkland "would do nothing for deterrence or fostering respect for the law in this defendant if he were released now," as "[d]eterrence demands that" Judge Nickerson's sentencing "decision [should] not be undone."  *Id.*

A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  The government notes that

Kirkland "does not have a clean record" while in prison. *Id.* at 10.   Specifically, Kirkland has received several disciplinary sanctions while in prison, *id.* at 4–5: "(1) possessing a hazardous tool (2013); (2) exchanging money for contraband (2003); (3) operating a large gambling ring (2003); (4) providing a false statement (2003); and (5) phone abuse (2001)."

Defendant submitted a disciplinary record dated April 15, 2024.  ECF 405-6.  The record shows that his most recent infraction occurred in December 2012, more than a decade ago, when defendant was cited for possessing a hazardous tool.  *Id.* at 1.  Prior infractions include having a family member send money to another inmate (2003), involvement in a large gambling ring involving another inmate's family (2003), lying or falsifying a statement (2003), and phone abuse (2001).  *Id.* at 1–2.

Nonetheless, Kirkland maintains that describing him as "a model inmate is an understatement." ECF 338 at 16.  He asserts that, "[i]n more than 30-years, he is always respectful to staff and fellow inmates, and he is a dependable, active contributor to the prison community." *Id.* at 16.  Additionally, he states that he "has been a mentor to his fellow inmates since he has been committed to the BOP," and he has "been actively participating in programs and seeking positive change in prison."  *Id.* at 14; *see also id.* at 16.  He also claims to have "a very strong connection with his family and friends who are ready willing to help and assist him getting a job," *id.* at 14, and he cites "numerous certificates and his progress reports."  ECF 344 at 6.

Defendant submitted several letters of support from family members, including a brother, cousin, nephews, and nieces.  *See* ECF 405-5.  These letters reflect that defendant has "a family that is willing to support him 100% from cousins, nieces, and nephews," *id.* at 1; that Kirkland has encouraged family "to stay on the right path in life" and to "keep [] on the straight and narrow," *id.* at 2, 5; and that with Kirkland's encouragement his nephew graduated from high school and

took some college courses. *Id*. at 2. Another nephew wrote in a letter that Kirkland "has strong affection and passion for his family" and is the "rock-solid foundation for [their] family." *Id*. at 8.

Moreover, defendant submitted a letter from Rhonda Williams, who has known Kirkland for over thirty years. *Id.* at 12. She stated that if released she would help Kirkland seek employment at a hospital center, where she has worked as a coordinating manager for nearly thirty years. *Id*. She also stated that her brother was willing to help Kirkland receive OSHA classes and become certified as an asbestos inspector. *Id*.

Kirkland also submitted a character letter from the factory manager at UNICOR, where defendant has been employed while in prison. *Id.* at 7. The letter, dated January 2024, states that since Kirkland's start in September 2023, the manager has observed Kirkland "to be eager to learn, willing to pass along advice and experience, and he has shown himself to be a dependable, hard worker." *Id*.

Defendant's educational records show that he has taken classes for fork lift training; textiles; disease prevention; job placement; money management; and air and water pollution. ECF 405-7 at 1; *see also* ECF 403 at 18. He also cites to his "extensive employment history since 1995." ECF 403 at 18.

Further, Kirkland argues that he has served "hard time" at FCI Mendota, and he is entitled to "protections under the fifth, eight[h] and fourteenth amendments of the United States Constitution." ECF 338 at 18. He then details a list of complaints as to conditions at FCI Mendota. *Id.* at 18–20. In his view, the unsatisfactory conditions should be considered by the Court.

Kirkland's claims regarding prison conditions do not amount to grounds for compassionate release. However, I am mindful that Kirkland's incarceration in the midst of a global pandemic "increased the severity of the sentence beyond what was originally anticipated such that the

purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10- 761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

As the government maintains, the Court cannot overlook that Kirkland's crimes were extraordinarily serious. Kirkland held a leadership role in a drug trafficking organization, and members of that organization were involved in the murders of two individuals. One was a ten-year old child who was doing what children do—playing—when, tragically, he was caught in an exchange of gunfire on a public street. The other victim was a potential government witness. As to the witness, defendant is the one who provided information to the assailant that led to her ruthless assassination.

However, the First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Accordingly, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in this Circuit and elsewhere have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*,

455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F. Supp. 3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

As I see it, the period of incarceration that Kirkland has served to date is not sufficient to warrant his immediate release. In particular, this was an extremely serious case, involving a large quantity of dangerous drugs and two deaths, for which a substantial sentence is warranted, not only as punishment and to protect the public, but also to promote respect for the law. Moreover, while defendant's institutional record is generally favorable, defendant does not appear to fully accept responsibility for his actions, as evidenced by his numerous, unsubstantiated arguments that the court and the jury erred in multiple respects.

## V. Conclusion

For the reasons stated, I shall grant the Motion (ECF 338, ECF 403), in part. In particular, I conclude that, as to Count Four and Count Five, the factors under 18 U.S.C. § 3553(a) weigh in favor of reducing Kirkland's sentence from life imprisonment to concurrent terms of 40 years of imprisonment, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), with credit dating from March 15, 1994, and with the added requirement of five years of supervised release, to include the mandatory conditions of supervision and the standard conditions of supervision that were previously imposed.

An Order follows, consistent with this Memorandum Opinion.  An Amended Judgment shall issue.

Date: October 18, 2024                                    _____/s/_____

                                                         Ellen Lipton Hollander
                                                         United States District Judge